178 Cal.App.4th 139 (2009)
In re J.O. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent,
v.
MARTIN O., Defendant and Appellant.
No. B211535.
Court of Appeals of California, Second District, Division Four.
September 9, 2009.
*143 Lori Fields, under appointment of the Court of Appeal, for Defendant and Appellant.
Raymond G. Fortner, County Counsel, James M. Owens, Assistant County Counsel, and Byron G. Shibata, Associate County Counsel, for Plaintiff and Respondent.

OPINION
MANELLA, J.
Appellant Martin O. is the alleged father of J.O. (J.O.I), a 17-year-old girl, B.O., a 16-year-old boy, and J.O.II, a 14-year-old boy (collectively, the O children or the children).[1] Appellant contends the trial court erred in ruling he was not the children's presumed father and in making jurisdictional findings under Welfare and Institutions Code, section 300, subdivisions (b) and (g) based on appellant's failure to provide support for many years.[2] Appellant further contends the court failed to properly comply with the procedures of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA). We conclude the court erred in ruling that appellant was not the O children's presumed father. However, the court's jurisdictional finding under section 300, subdivision (g) was supported by substantial evidence and is affirmed. We remand for entry of an order declaring appellant the presumed father and for compliance with ICWA procedures.

*144 FACTUAL AND PROCEDURAL BACKGROUND
The O children were detained, along with their three half siblings, in June 2008 as a result of the alleged physical and sexual abuse of J.O.I.[3] The court sustained findings under section 300, subdivision (a) (serious physical harm), subdivision (b) (failure to protect), subdivision (d) (sexual abuse) and subdivision (g) (no provision for support). Under subdivision (a), the court found that Mother "used a safety pin and a knife to scrape ink marks, which [Mother] believed to be tattoos, from the skin on [J.O.I's] wrist and leg" and had on prior occasions "inappropriately and excessively physically disciplined [J.O.I] by pulling [her] hair and striking [her] face."[4] Under subdivision (d), the court found that Carlos "made sexual comments and gestures toward [his stepdaughter J.O.I], causing the child to feel sexually threatened," including "fondling her legs and vaginal area over her clothing."
In two findings that pertained to appellant, the court found under section 300, subdivisions (b) and (g), that appellant "failed to provide the children with the necessities of life including food, clothing, shelter and medical care."[5]
After detention, the O children were placed in a series of foster homes. DCFS investigated Mother's relatives for placement. A maternal aunt who volunteered to accept custody had a prior history with DCFS, which rendered her unacceptable. Other maternal relatives who volunteered to assume custody required waivers for various reasons.[6] Accordingly, the children remained in foster care.[7]
In multiple interviews, Mother informed the caseworker that appellant was the father of the O children and that he was living in Mexico after spending time in Missouri. The caseworker located appellant in Mexico. He confirmed that he was the children's father. Appellant reported that he and Mother had never been married and that they broke off their relationship when she *145 became involved with Carlos. Appellant claimed that while living in Missouri he had sent Mother money "a couple of times." Appellant told the caseworker he was "interested" in getting custody of the children. The caseworker spoke with a maternal aunt (Mother's sister) who said that appellant went to Missouri for work-related reasons when J.O.I was in preschool and that when appellant was ready for his family to follow, Mother informed him she had become involved with Carlos. J.O.I reported that she had last spoken with her "dad," referring to appellant, approximately three years previously. B.O. reported that appellant stopped calling "a long time ago," and that the family had had no contact with him in years. J.O.II said he spoke with his "dad," referring to appellant, when he was five (J.O.II turned five in the year 2000) and wished to speak with him again. DCFS obtained the birth certificates for the children, which identified appellant as their father.
Prior to the detention hearing on June 23, 2008, Mother filled out a paternity questionnaire under penalty of perjury. It stated that appellant had not signed papers establishing paternity at the hospital and had never been married to Mother. However, according to the questionnaire, Mother and appellant were living together at the time of the children's birth and appellant held himself out as the children's father and accepted the children openly in his home. At the hearing, Mother was questioned by the court and confirmed that all three of the O children had lived with appellant from their births until the couple separated in 1996. She stated that appellant last had telephonic contact with the children sometime around 1999. The court found true that appellant had held himself out as the children's father and openly accepted the children into his home, but deferred a finding on his status as a presumed father.
On July 22, 2008, the court appointed counsel to represent appellant. The court instructed counsel to attempt to contact appellant and ordered DCFS to initiate a referral for appellant with DIF (Desarrollo Integral de la Familia, a Mexican social services agency) and to facilitate telephone calls between appellant and the children. DCFS contacted the Mexican consulate, requesting that DIF conduct a home visit and assess the suitability of appellant's home.[8]
At the jurisdictional/dispositional hearing on August 27, 2008, appellant's counsel reported that a Spanish-speaking employee in her office had talked with appellant over the telephone. Appellant had said during that conversation that he lived with Mother and the children until 1996, when he went to Missouri to accept a position as a restaurant manager. Appellant anticipated the family would eventually reunite in Missouri. According to counsel, between 1996 and 2000, appellant sent Mother approximately $500 per *146 month to support the children. The court ruled that this information was inadmissible and admonished counsel for failing to obtain a sworn statement from appellant. Counsel requested a continuance to obtain an affidavit, which the court denied.
After considering the evidence in the reports and the information provided by Mother, the court found that appellant had held himself out as the children's father and openly accepted them into his home for one year with respect to the youngest, three years with respect to the middle child, and four years with respect to the oldest. The court noted that although appellant's name appeared on their birth certificates, his name could have been put there without his consent. Relying on In re A.A. (2003) 114 Cal.App.4th 771 [7 Cal.Rptr.3d 755] for the proposition that "even if someone has held himself out as the father, and openly accepted the children into his home," his presumed father status could "fall away," the court ruled that appellant was an alleged father only, because he had not had contact with the children or provided financial support for many years.
Despite having ruled that appellant was not a presumed father, the court made jurisdictional findings that pertained to appellant and, during the dispositional phase of the hearing, provided reunification services. The court ordered appellant to drug test, enroll in parenting classes, and visit or contact the children in order to form a relationship. Counsel for appellant asked on his behalf that the children be released to appellant's brothers, who were residing in Missouri. The court ordered DCFS to initiate the ICPC process (Interstate Compact on the Placement of Children) to determine whether the children could be placed with these out-of-state parties. (See Fam. Code, § 7900 et seq.)

DISCUSSION

A. Presumed Father Status

(1) "In dependency proceedings, `fathers' are divided into four categoriesnatural [or biological], presumed, alleged, and de facto." (In re A.A., supra, 114 Cal.App.4th at p. 779.) A biological father is one whose paternity is established, but who does not qualify as a presumed father. (Ibid.; In re Kobe A. (2007) 146 Cal.App.4th 1113, 1120 [53 Cal.Rptr.3d 437].) An alleged father is a man who may be the father, but who has not yet established *147 himself as either a biological father or a presumed father. (In re Kobe A., supra, at p. 1120.)[9]
The distinction is important because only a presumed father is entitled to custody or a reunification plan. (In re Kobe A., supra, 146 Cal.App.4th at p. 1120; In re Paul H. (2003) 111 Cal.App.4th 753, 760 [5 Cal.Rptr.3d 1]; In re O.S. (2002) 102 Cal.App.4th 1402, 1406-1407 [126 Cal.Rptr.2d 571].) An alleged father is not entitled even to appointed counsel, except for the purpose of establishing presumed fatherhood. (In re Kobe A., supra, at p. 1120; In re Paul H., supra, 111 Cal.App.4th at p. 760.) Indeed, it is generally said that an alleged father's rights are limited to "an opportunity to appear and assert a position and attempt to change his paternity status. . . ." (In re Kobe A., supra, 146 Cal.App.4th at p. 1120; accord, In re Paul H., supra, 111 Cal.App.4th at p. 760; In re O. S., supra, 102 Cal.App.4th at p. 1408.)
(2) The various statutory methods for establishing a presumption of paternity are contained in the Family Code. (See, e.g., Fam. Code, § 7540 [child of wife cohabiting with husband who is not impotent or sterile conclusively presumed to be child of the marriage]; §§ 7571-7572 [paternity established where man identified by mother as natural father executes voluntary declaration of paternity at hospital where child is born]; § 7611, subd. (a) [presumption arises where man is married to mother and child is born during marriage or within 300 days afterward]; § 7611, subd. (b) [presumption arises where man attempted to marry mother prior to child's birth, but marriage is or could be declared invalid]; § 7611, subd. (c) [presumption arises where man attempted to marry mother after child's birth and is named on birth certificate with his consent or voluntarily undertakes legal support obligation].) The provision applicable here, Family Code section 7611, subdivision (d) (section 7611(d)), provides that a man is presumed to be the natural father of a child or children if "[h]e receives the child into his home and openly holds out the child as his natural child."
A man who claims entitlement to presumed father status has the burden of establishing by a preponderance of the evidence the facts supporting his entitlement. (In re T.R. (2005) 132 Cal.App.4th 1202, 1210 [34 Cal.Rptr.3d 215].) "Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, `there can be only one presumed father.'" (In re Jesusa V. (2004) 32 Cal.4th 588, 603 [10 Cal.Rptr.3d 205, 85 P.3d 2].) The Family Code section 7611(d) presumption, once it arises, "may be rebutted in an appropriate action only by clear and convincing *148 evidence." (Fam. Code, § 7612, subd. (a) (section 7612(a)).) Here, the trial court found that appellant had established the presumption under section 7611(d), but that it had been rebutted. The issue is whether appellant's failure to care for or to provide financial support to his children warrants rebuttal of the presumption of paternity that arises under section 7611(d).
Family Code section 7612(a) provides that the presumptions arising under Family Code section 7611, including the presumption of section 7611(d), "may be rebutted in an appropriate action." The Supreme Court has repeatedly stated that section 7612(a) should not be applied to rebut a presumption of fatherhood arising under section 7611(d) where the result would be to leave children with fewer than two parents. In In re Nicholas H. (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932], for example, the man seeking presumed father status had taken care of the child (a six-year-old boy) and his mother for five years, but was not the biological father. (28 Cal.4th at pp. 59-61.) The respondent contended the lack of a biological connection rebutted the section 7611(d) presumption. The Supreme Court disagreed: "Section 7612(a) provides that `a presumption under Section 7611 [that a man is the natural father of a child] is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence.' [Italics added by Supreme Court.] When it used the limiting phrase an appropriate action, the Legislature was unlikely to have had in mind an action like thisan action in which no other man claims parental rights to the child, an action in which rebuttal of the section 7611(d) presumption will render the child fatherless. Rather, we believe the Legislature had in mind an action in which another candidate is vying for parental rights and seeks to rebut a section 7611(d) presumption in order to perfect his claim, or in which a court decides that the legal rights and obligations of parenthood should devolve upon an unwilling candidate." (28 Cal.4th at p. 70.)
(3) The Supreme Court repeated the admonition against applying Family Code section 7612(a) to rebut a presumption of parenthood arising under Family Code section 7611(d) where the result would be to leave a child with fewer than two parents in Elisa B. v. Superior Court (2005) 37 Cal.4th 108 [33 Cal.Rptr.3d 46, 117 P.3d 660]. There, a woman whose children were born during a committed lesbian relationship and treated by her partner as the partner's children for many years sought child support after the relationship ended. The former partner clearly met the standard for presumed parenthood under section 7611(d). In determining whether the presumption should be given effect, the court explained: "In establishing a system for a voluntary declaration of paternity in [Family Code] section 7570, the Legislature declared: `There is a compelling state interest in establishing paternity for all children. Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, *149 including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights....' [¶] By recognizing the value of determining paternity, the Legislature implicitly recognized the value of having two parents, rather than one, as a source of both emotional and financial support, especially when the obligation to support the child would otherwise fall to the public." (37 Cal.4th at p. 123.) Accordingly, the case before it was "not `an appropriate action' in which to rebut the presumption" of section 7611(d). (37 Cal.4th at p. 122; see also Librers v. Black (2005) 129 Cal.App.4th 114, 123 [28 Cal.Rptr.3d 188] ["[W]henever possible, a child should have the benefit of two parents to support and nurture him or her."].)
Neither Nicholas H. nor Elisa B. involved a father who discontinued contact with the children and provided no financial support after the mother remarried. However, we believe the Supreme Court's admonition that courts should not render children fatherless by too easily finding cause to rebut the Family Code section 7611(d) presumption is equally applicable in the present, rather commonplace situation. Appellant, Mother and the O children all recognized appellant as the children's father. His name is on their birth certificates. He acknowledged the children at birth and supported them for several years. Refusing to grant presumed father status to a man such as appellant, where no other parental figure is available to fill the gap, would serve only to punish the children by depriving them of a second parent. In addition, it would for all practical purposes deprive them of a connection with their father's family and the opportunity of finding a home with one of the father's relatives, should the mother's attempt at reunification fall short.[10]
(4) Respondent cites no authority for the proposition that abandonment combined with failure to support is a basis for rebutting the Family Code section 7611(d) presumption, and our research has uncovered none.[11] A *150 biological father's failure to maintain a relationship with the children or to provide support is a relevant factor to be considered in the context of resolving the competing claims of two different men, both of whom can establish a presumption of fatherhood under the provisions of the Family Code. (Fam. Code, § 7612, subd. (b); see, e.g., In re Jesusa V., supra, 32 Cal.4th at p. 603.) That situation is governed by Family Code section 7612, subdivision (b), which provides: "If two or more presumptions arise under [Family Code] Section ... 7611 that conflict with each other, . . . the presumption which on the facts is founded on the weightier considerations of policy and logic controls." In choosing between competing claims of presumed fatherhood, juvenile courts are obliged to "weigh all relevant factors. . . in determining which presumption was founded on weightier considerations," including whether the biological father had continued to be involved in the children's lives or had effectively abandoned them at an early age. (In re Jesusa V., supra, 32 Cal.4th at pp. 607-608.) However, Family Code section 7612, subdivision (b) has no applicability here. No man other than appellant has sought fatherhood status with respect to the O children. The only other man who has had a significant relationship with the childrentheir stepfather Carloshas demonstrated no interest in their well-being. The children, for their part, have expressed their disinclination to maintain a relationship with Carlos. Accordingly, affirming the juvenile court's ruling would effectively leave the children fatherless.
Implicitly recognizing the lack of support for the court's ruling that the Family Code section 7611(d) presumption had been rebutted, respondent attacks the juvenile court's finding that the section 7611(d) presumption arose under the evidence presented. Respondent cites two adoption cases, Adoption of Kelsey S. (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] and Adoption of O.M. (2008) 169 Cal.App.4th 672 [87 Cal.Rptr.3d 135], for the proposition that a court should consider multiple factors before making a finding under section 7611(d), including the alleged father's "payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child."
(5) Both Kelsey S. and O.M. involved biological fathers who were unable to establish a presumption of fatherhood under any statutory provision because their attempts at contact and custody were stymied by the mothers, who preferred to free the children for adoption. (See Adoption of Kelsey S., supra, 1 Cal.4th at pp. 825-830; Adoption of O.M., supra, 169 Cal.App.4th at p. 678.) The Supreme Court concluded in Kelsey S., in a holding which was *151 followed by the court in O.M., that a biological father may have a constitutional right under the due process and equal protection clauses of the Fourteenth Amendment to preserve his opportunity to develop a parental relationship with a child where he "comes forward and demonstrates a full commitment to his parental responsibilities" by "attempt[ing] to assume his parental responsibilities as fully as the mother will allow and his circumstances permit" within a short time after he learns of the pregnancy. (Kelsey S., supra, at p. 849; see O.M., supra, at pp. 678-679.) In making the determination whether a natural father has established a nonstatutory right to parenthood, the courts are to consider "[t]he father's conduct both before and after the child's birth," including the "public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (1 Cal.4th at p. 849, italics omitted.) The factors discussed in Kelsey S. and applied in O.M. are not pertinent to the instant case. (6) Family Code section 7611(d) requires nothing more than that the presumed father candidate receive the children into his home and openly hold them out as his natural children. Appellant established these foundational facts to the court's satisfaction, and the issue was whether the presumption had been rebutted. As the sole basis for the juvenile court's ruling that appellant's presumed father status had been rebutted was appellant's failure to keep in contact with and support his family, the court's ruling lacks support and must be reversed.

B. Request for Continuance

As we conclude that the evidence established appellant's presumed father status, counsel's request for reversal of the court's denial of the request for continuance to obtain further evidence is moot.

C. Jurisdictional Findings

The court found that jurisdiction over the children was proper under section 300, subdivision (a) (serious physical harm), subdivision (b) (failure to protect), subdivision (d) (sexual abuse) and subdivision (g) (no provision for support). The only allegation pertaining to appellant was the allegation that he "failed to provide the children with the necessities of life including food, clothing, shelter and medical care," which the court found true. The court further found that the allegation supported jurisdiction under subdivisions (b) and (g). Appellant asserts that the allegation did not support jurisdiction because the children's harm was not caused by the failure to provide support and because he expressed willingness to take custody after being contacted by DCFS. We conclude that the factual finding supported jurisdiction under section 300, subdivision (g), but not subdivision (b).

*152 1. Subdivision (b)

(7) Jurisdiction is appropriate under section 300, subdivision (b) where the court finds "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . ." The parties acknowledge that three elements must exist for a jurisdictional finding under section 300, subdivision (b): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) `serious physical harm or illness' to the minor, or a `substantial risk' of such harm or illness." (In re Rocco M. (1991) 1 Cal.App.4th 814, 820 [2 Cal.Rptr.2d 429].) "The third element `effectively requires a showing that at the time of the jurisdiction hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur). [Citations.]'" (In re David M. (2005) 134 Cal.App.4th 822, 829 [36 Cal.Rptr.3d 411], quoting In re Savannah M. (2005) 131 Cal.App.4th 1387, 1396 [32 Cal.Rptr.3d 526].)
Appellant contends there is no causal nexus between the court's findings of serious injury and the findings relating to appellant. We agree. Mother's use of a safety pin and knife to scrape ink tattoos from J.O.I's wrist and leg; Mother's inappropriate and excessive physical discipline of J.O.I; and Carlos's sexual comments, gestures and touching directed toward J.O.I have no relation to appellant's failure to provide the children with support or financial assistance. Respondent asserts that the failure to provide medical care caused J.O.I to "endure her injuries without medical attention." The court made no specific finding that J.O.I was deprived of necessary medical care. Moreover, it appears from the record that J.O.I was forced to endure her injuries without medical attention because Mother and Carlos did not believe the injuries warranted medical attention or alternatively, did not want her to be closely examined by medical personnel.[12] These actions were not caused by appellant's abandonment or failure to provide support.[13]

*153 2. Subdivision (g)

(8) Section 300, subdivision (g) provides that jurisdiction is warranted where "[t]he child has been left without any provision for support . . . ." As respondent points out, subdivision (g) does not require a specific finding of harm or risk of harm.[14]
(9) Neither party has cited any authority which addresses whether a parent who leaves his or her children with the other parent, providing no financial support, has left the children "without any provision for support" within the meaning of section 300, subdivision (g), justifying a decision to take jurisdiction over the children.[15] In some cases involving incarcerated parents, courts have said that making arrangements for the child to be cared for by a relative or friend without apparent financial recompense is sufficient to avoid subdivision (g) jurisdiction. (See, e.g., In re S. D. (2002) 99 Cal.App.4th 1068, 1078 [121 Cal.Rptr.2d 518] [issue under § 300, subd. (g) was whether incarcerated mother "could arrange for care" with out-of-state sister]; In re Monica C. (1995) 31 Cal.App.4th 296, 305 [36 Cal.Rptr.2d 910] [subd. (g) applies only where parent is incapable of making plans for care of child]; see also In re James C. (2002) 104 Cal.App.4th 470, 484 [128 Cal.Rptr.2d 270] [agreeing with rule, but finding incarcerated father incapable of making preparations for children's care].) Whether a parent can arrange for care is to be determined as of the date of the jurisdictional hearing, and a noncustodial parent's failure to make arrangements before the child is removed by DCFS does not cause the child to fall within the terms of section 300, subdivision (g). (In re Aaron S. (1991) 228 Cal.App.3d 202, 204, 209 [278 Cal.Rptr. 861] [where minor removed from mother due to substance abuse, incarcerated father's failure to immediately arrange for care "does not necessarily prove . . . that any such inability continues to exist at the present time"]; see In re Nicholas B. (2001) 88 Cal.App.4th 1126, 1134 [106 Cal.Rptr.2d 465] ["The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm."].)
Assuming section 300, subdivision (g) applies only where the parent is unable to provide or arrange care for the children at the time of the *154 jurisdictional hearing, substantial evidence supports the conclusion that appellant was incapable of providing such care.[16] According to the uncontested evidence, appellant had given no financial support to his family for at least eight years. The court could reasonably infer from this fact that he was incapable of doing so, despite his professed "interest" in obtaining custody. (See In re Aaron S., supra, 228 Cal.App.3d at p. 209 [evidence that father failed to arrange for children's care before detention "relevant to a determination of [father's] present ability to make such arrangements"].) Moreover, appellant had no relationship with the children. He had not lived with them for more than a dozen years, and when he left the oldest had barely entered preschool. Even his rare telephonic contacts ceased at least three years prior to the detention.[17] His scant interest in the children was demonstrated by his failure to make inquiry concerning their welfare over the years. Even after the case was pending and his children were placed in foster care, he made no affirmative attempt to communicate with DCFS or DIF to establish his circumstances and present ability to care for them. As the court stated in James C.: "The absence of evidence suggesting that the father was ever interested in the welfare of the two toddler children during the entire time of his incarceration was sufficient for the juvenile court to infer that he either could not or was incapable of making preparations for their care." (In re James C., supra, 104 Cal.App.4th at p. 484.) Appellant's failure to provide financial support for over a decade, combined with his demonstrated lack of interest in the children's welfare before and after DCFS intervention, supported the court's jurisdictional finding under subdivision (g).

D. ICWA

(10) ICWA requires that when a court knows or has reason to know that an Indian child is involved in a dependency matter, it must ensure that notice is given to the relevant tribe or tribes. (25 U.S.C. § 1912(a).) Rule 5.481 of the California Rules of Court provides that the juvenile court "ha[s] an affirmative and continuing duty to inquire whether a [dependent] child is or may be an Indian child . . . ." Because the court did not consider appellant the O children's presumed father, it did not inquire about possible Indian ancestry on appellant's side. On remand, this omission must be corrected.

DISPOSITION
The order declaring appellant an alleged father only is reversed. The finding of jurisdiction under section 300, subdivision (b) is reversed. In all *155 other respects the judgment is affirmed. On remand, the court is instructed to enter an order declaring appellant the presumed father of J.O.I, B.O. and J.O.II and to make the inquiry concerning appellant's possible Indian ancestry required by ICWA and the California Rules of Court.
Epstein, P. J., and Suzukawa, J., concurred.
NOTES
[1] The children were a year younger on the date of the DCFS (Los Angeles County Department of Children and Family Services) intervention.
[2] Unless otherwise designated, statutory references are to the Welfare and Institutions Code.
[3] Juana G. (Mother) is the children's mother. Carlos F., her husband, is the father of the three half siblings. Neither Juana nor Carlos is a party to this appeal. This appeal does not concern Carlos's children.
[4] The tattoo removal had occurred two weeks prior to the referral and J.O.I's skin was scabbed over by the time of the detention. Carlos had been making inappropriate comments for some time and J.O.I had reported inappropriate comments and touching to Mother two or three months earlier.
[5] Mother and Carlos stipulated to the jurisdictional findings; appellant did not. Mother and Carlos also signed statements in June 2008 denying Indian ancestry.
[6] The home of the maternal grandparents was too small. A maternal uncle had a DUI (driving under the influence) conviction and no current driver's license.
[7] Carlos's children were taken in by his relatives. The O children informed the court through their counsel that they wanted nothing to do with Carlos.
[8] There is no indication in the record of any response.
[9] Not relevant here is the term "de facto father," which refers to "someone such as a stepparent who has, on a day-to-day basis, assumed the role of a parent for a substantial period of time." (In re A.A., supra, 114 Cal.App.4th at p. 779.)
[10] We note in this regard that so far, none of Mother's relatives has been approved for custody, and the court ordered DCFS to investigate the home of paternal uncles in Missouri.
[11] The juvenile court purported to rely on the decision in In re A.A., supra, 114 Cal.App.4th 771, but that case does not support the ruling. In A.A., where two men claimed to be the presumed father, the juvenile court ruled in favor of the biological father, H.O., after a paternity test established his biological connection. The evidence otherwise established that H.O. had lived with the mother for only one to three months after the child's birth, had visited the child, a six-year-old girl, for a year or so thereafter, and had failed to financially support the child at any time. Taking note of H.O.'s avoidance of "the constant parental-type tasks that come with having the child in his own homesuch as feeding and cleaning up after the minor, changing her clothing, bathing her, seeing to her naps, putting her to bed, taking her for outings, playing games with her, disciplining her, and otherwise focusing on the child," the Court of Appeal concluded that the evidence was insufficient to establish that H.O. received the child into his home and openly held her out as his natural child. (Id. at pp. 786-787.) The court found, on the other hand, that the evidence clearly established the competing claimant's entitlement to the Family Code section 7611(d) presumption, as he had taken the child into his home, cared for her, provided financial support and held himself out as her father over the course of many years. As the holding in A.A. with respect to the biological father was based on the lack of evidence to give rise to the Family Code section 7611(d) presumption, it does not support the juvenile court's ruling in the present case that appellant's presumed father status arose under section 7611(d), but "fell away" due to abandonment and failure to support.
[12] Mother stated that she made a medical appointment for J.O.I after removing the tattoos, but cancelled it because the wounds appeared to be healing.
[13] Respondent alternatively contends that the juvenile court could consider "all of [appellant's] past conduct as it related to section 300, subdivision (b)not only his failure to provide the necessities of life for the children." "[F]undamental ... due process" requires "[n]otice of the specific facts upon which removal of a child from parental custody is predicated" in order to "enable the parties to properly meet the charges." (In re Jeremy C. (1980) 109 Cal.App.3d 384, 397 [167 Cal.Rptr. 283].) Accordingly, the court could not properly consider unalleged actions in making the jurisdictional finding. In any event, respondent fails to identify any conduct the court could have considered other than general neglect and failure to support.
[14] However, a child cannot be detained from a parent unless the court finds evidence of substantial danger of injury or detriment to the child. (§ 361, subd. (c) [custodial parent]; § 361.2, subd. (a) [noncustodial parent].)
[15] In In re Janet T. (2001) 93 Cal.App.4th 377, 392 [113 Cal.Rptr.2d 163], the court held that a finding under section 300, subdivision (g) that the father, whose whereabouts were unknown, had failed to provide support could not be used as justification to declare the children dependents and detain them from their custodial parent, the mother, who had provided good care. To the same effect, see In re Matthew S. (1996) 41 Cal.App.4th 1311, 1319-1320 [49 Cal.Rptr.2d 139].
[16] Appellant made no effort to arrange for the children's care until after the court's jurisdictional findings, when his counsel asked the court to consider placement with paternal uncles. Appellant presented no evidence that the uncles were willing or able to accept custody.
[17] This was according to J.O.I's recollection; according to Mother, it had been much longer.