Filed 7/19/21  In re I.J. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| In re I.J., et al., Persons Coming Under Juvenile Court Law. | B308326 |
| _____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.J.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP00669A-C) |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Mother appeals after the juvenile court declared her three children dependents of the court by sustaining a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b), and (j).[1]  She argues there was insufficient evidence her three children suffered or were at risk of serious physical harm.  We affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

The family consists of mother and her three sons, 12-year-old IJ (born 2008), 10-year-old R (born 2010), and 8-year-old N (born 2013).[2]  Mother also had a fourth child (born 2014), who died in March 2015 when he was seven months old.  The cause of the baby's death was undetermined, though contributing factors included unsafe sleeping environment, co-sleeping, and a rhinovirus infection.

At the time the Department of Children and Family Services (DCFS) intervened on behalf of the children, Eduardo (mother's boyfriend who does not share any children with mother), resided with mother and the three children in a three-bedroom home owned by the maternal grandfather.  Mother and Eduardo had been together for over four years.  The maternal uncle, the maternal aunt, and several cousins also resided in the family home.  Mother reported that no one paid rent since the maternal grandfather owned the family home.

---

[1]      All subsequent statutory references are to the Welfare and Institutions Code.

[2]      Mother was 13 years old when she became pregnant with her eldest.

The children's respective fathers do not appeal.[3]

## 1. DCFS History

From March 2006 to November 2010, mother was herself a dependent child. She denied experiencing abuse or neglect as a child.

As an adult, mother has had an extensive history with DCFS which included an agreement to Voluntary Family Maintenance (VFM) due to her baby's death. In that case, mother was unable to participate in the recommended programs due to her hospitalization in November 2015 for a stomach procedure. The VFM case was closed due to mother's "incapacity to participate in the recommended Domestic Violence [program] and counseling."

Mother had seven other prior DCFS referrals alleging physical abuse, neglect, and/or emotional abuse. Five referrals were deemed inconclusive, one referral was deemed unfounded, and a 2017 referral for general neglect involving domestic violence between Mother and Eduardo was substantiated. Per the police report in the last referral, Eduardo pushed mother to the ground during an argument and then punched a wall, damaging it.[4] DCFS did not open a case in 2017 related to that neglect because, after his arrest for the domestic violence incident, mother obtained a restraining order against Eduardo.[5]

---

[3] Mother and the children had no recent contact with the children's respective fathers.

[4] Mother admitted Eduardo had engaged in domestic violence, but asserted that Eduardo never hit her.

[5] Eduardo's criminal record was so extensive that DCFS described the California Law Enforcement Telecommunications

The order barred Eduardo from contacting or coming within 100 yards of mother and the children. Five months after the order was issued, mother had the restraining order modified to allow for peaceful contact, which led Eduardo to return living in the family home. Evidence was that Eduardo has lived there since without additional domestic violence incidents.

In 2017, in proceedings related to one of the inconclusive referrals, the eldest child (IJ) disclosed that he was afraid to go home because mother hits him. He said that mother had hit him with a belt a few months earlier. The child also reported " 'my mom used to hit me, but not anymore . . . but sometimes she still slaps me.' "

## 2. *Present Physical Abuse*

On September 27, 2019, DCFS received a referral alleging that mother and Eduardo physically abused then-eight-year-old R. The reporting party stated R disclosed that Eduardo had kicked R's legs or hit his stomach with an open hand when R refused to go to bed. R told the reporting party that Eduardo hit him "kind of hard" and that the last time he was kicked was " 'a long time ago,' " or " '18 months ago.' " R denied having any marks or bruises.

In October 2019, DCFS went to the family home and interviewed mother, Eduardo, and the children. The family's three-bedroom, three-bath home consistently appeared clean. DCFS interviewed the family again in January and May 2020. We summarize the family's statements below.

### a. R's Interviews

In October 2019, R was in the third grade. He stated he was not allowed to use his computer tablet for one hour whenever

System as showing "too many hits" for Eduardo's criminal history to be described in detail.

he got into trouble.  In contrast to what the reporting party told DCFS the month before, R denied ever being spanked by mother or Eduardo, denied being hit or kicked by anyone in the home, and denied that anyone had talked to him about meeting with the social worker.  R reported he felt safe in the home because his "big brother was there to protect him."  The social worker observed R had several white scars on the top part of his left and right arms.  When asked about the scars, R reported he had fallen and scraped his arm.[6]

In a January 2020 interview, R reiterated that neither he nor his siblings were abused or neglected, and that he felt safe at home.  R acted confused when the social worker told him the basis for DCFS's inquiry was R's October 2019 statement to his therapist that Eduardo had hit and kicked him.  At the end of January 2020, a forensic medical evaluation of R revealed that he had a purple bruise with an abrasion on his forearm from his brother IJ biting him.  The nurse practitioner evaluating him reported that mother said R had behavioral issues and was aggressive toward his siblings.  R was attending weekly therapy sessions.

In May 2020, R again denied any physical abuse.

**b.    IJ's Interviews**

In October 2019, mother's eldest child, IJ, was in middle school.  He was then 11 years old.  IJ reported that mother disciplined him by taking away his cellphone.  IJ denied being spanked or that Eduardo had ever hit him.  He said he did not know why R reported being hit.  IJ also denied that mother or Eduardo had talked to him about meeting with the social worker.

---

[6]    In January 2020, R had several scratches across the right and left arms, which he attributed to a squirrel attacking him at the park.

He felt safe in the family home.  IJ again denied experiencing abuse when he was interviewed by DCFS in January and May 2020.  IJ had old scars on his elbow.  It appeared that IJ had behavioral problems and scratched, bit, and hit his brothers.  IJ had not yet been enrolled in behavioral therapy

    **c.**    **N's Interviews**

In October 2019, mother's youngest son, N was six years old and in first grade.  N stated that mother punished him by taking away his tablet or phone, and hitting him with a belt.  He said Eduardo never hit him.  N was unable to report if his brothers were also hit with a belt, identify the last time he was hit by mother, or explain why he was hit.  N then stated that " 'a couple months ago,' " mother had hit him with a belt 11 times for not listening to her.  N explained mother hit him more often than she would discipline him by taking away the tablet or telephone.  N also reported feeling safe at home.

A few months later, in January 2020, N denied to social workers that he had experienced abuse and neglect, and denied seeing his siblings abused or neglected.  At the time, N had scratch marks on his arms that he attributed to IJ biting and scratching him.  N said that whenever he and his brothers got punished for something, IJ would become aggressive toward N and R.  Mother confirmed IJ bit and scratched the other children.  A week later, N underwent a forensic medical examination and again reported that mother had hit him with a belt.  He said this had happened when he was in kindergarten.[7]  The evaluation revealed that N had old facial scars, but no physical evidence of present abuse.

---

[7]    At the time of the evaluation, N was midway through first grade.

In May 2020, N repeated that mother had hit him with a belt a "long time ago." He did not know how old he was when it happened but stated she did not hit him anymore. He was not scared of mother.

### d. The Interviews of Mother and Eduardo

When asked during an October 2019 interview with DCFS, mother denied ever physically disciplining the children, and stated that, for punishment, she took things away from them. In a January 2020 interview with a forensic medical evaluator, mother admitted to hitting the children with a belt as a form of discipline, but stated she had not used the belt since 2015. In May 2020, mother changed her story again. At that juncture, mother stated, " 'No, I didn't hit [N] with the belt. I don't physically abuse my children,' " " 'I only take away things when they don't listen to me,' " and " 'I don't let him use the tablet or my phone to play games.' " Mother added, " '[N] had no marks. I never hit him with the belt. I would spank him when he was like [three] years old. I didn't cause my son pain and suffering. He had no belt marks. He did have old scars because of his brothers.' " Mother repeated, " 'I don't' physically abuse my kids.' "

Mother said her live-in boyfriend, Eduardo, was the only other person allowed to punish her children and that he had never physically disciplined or hit the children. Mother was present with the children most of the time because she was a stay-at-home mother. Mother explained R had told his therapist that Eduardo kicked him out of his room, and that R's statements were taken out of context by the therapist: R did not mean he was physically kicked by Eduardo.[8]

---

[8]     It appears that R's therapist was the reporting party who initiated the present referral to DCFS.

When interviewed, Eduardo denied that he or mother physically disciplined the children. Eduardo stated that, whenever he could, he was still participating in domestic violence classes related to the 2017 criminal restraining order. As of January 2020, Eduardo's attendance had been spotty: he completed only 18 of the 52 classes. Eduardo said he returned to the family home because mother needed him to continue contributing towards the rent and he was financially unable to rent his own place.[9]

In May 2020, Edwardo denied that mother physically abused the children or spanked them, and denied they were in danger with her. Eduardo said mother disciplined the children by taking away their videogames or telephones and talking to them. He denied hitting the children and said he was against hitting.

Mother and Eduardo were open to receiving the same services DCFS had provided in mother's 2015 VFM case, where the children remained in mother's home. Mother and Eduardo planned to marry after resolving their issues with DCFS.

DCFS expressed concern the parents coached the children "not [to] disclose physical abuse, as the children appear to have old scars, abrasions and have reported abuse in the past."

### 3.    *Section 300 Petition*

On February 4, 2020, DCFS filed a non-detained section 300 petition, alleging under subdivisions (a), (b), and (j):

> "On prior occasions, the children [IJ], [R], and [N]'s
> mother, . . . physically abused the child [N] by
> striking the child's body with belts. Such physical
> abuse was excessive and caused the child

---

[9]    This statement was inconsistent with mother's statement that she and her siblings did not pay rent.

unreasonable pain and suffering.  Such physical abuse of the child by the mother endangers the child's physical health and safety and places the child and the child's siblings, [IJ] and [R], at risk of serious physical harm, damage, danger, and physical abuse."

At the February 5, 2020, detention hearing, the juvenile court released the children to mother and allowed Eduardo to remain in the home.

### 4.     *Services Prior to the Jurisdiction Hearing*

In July 2020, Mother reported completing parenting education and participating in seven sessions of individual counseling.  Mother's therapist reported mother had been "punctual, open, motivated, engaged and willing to work on treatment goals.  The mother has been consistent."  Mother was on a waiting list for domestic violence counseling.  The children had been receiving individual counseling.

The same month, Eduardo completed a 10-week parenting course.  He was expected to finish his court-mandated 52-week domestic violence program that summer.

All three children were receiving individual therapy.

### 5.     *Jurisdiction and Disposition*

The combined jurisdiction and disposition hearing occurred on October 5, 2020.  The juvenile court received into evidence, without objection, various DCFS reports.

DCFS argued that mother minimized the physical abuse she committed when she hit N with a belt.  DCFS was concerned about the children's safety given the family history of referrals alleging physical abuse, the previous domestic violence between Eduardo and mother, the young age of the children, and the baby's fatality in 2015.  DCFS advocated for sustaining the petition to "keep an eye on things" and to ensure mother and Eduardo complete their programs.

9

Counsel for each of the three children joined in DCFS's request to sustain the petition. R's counsel expressed additional concerns and argued, "[N] said . . . that he was hit with a belt when he was in kindergarten. And there have been several referrals in this case, as well as the domestic violence restraining order that was put in place in 2017, and that was lifted just several months later. [¶] So there are definitely concerns about DV in this case, which I believe put the children at risk, even though I know that is not what was pled in this case. But I am asking for all counts to be sustained as pled."

Mother's counsel asked the court to dismiss the petition in its entirety and argued, "Now both minors' counsel and county counsel have indicated that there is the information about domestic violence, mother losing her child. Those things are not pled. [¶] So they cannot ask the court now to take jurisdiction on a case based on information that is not only pled, but is not evidence of physical abuse to these children. The allegation is whether mother used a belt to discipline her children to the point where it constituted physical abuse, and we don't have that here." Mother's counsel argued there was no evidence of bruises, welts, broken skin and N's statements does not say he suffered any sort of injury. Mother's counsel, citing *In re Mariah T.* and *In re David H.*, argued that using a belt to spank a child did not, in and of itself, rise to the level of physical abuse. Counsel claimed "the evidence we have supports that mother used the belt in a way that was equivalent to age-appropriate spanking."

The juvenile court directed the following statement to DCFS's counsel: "I'm unclear why this petition is so thin. It looks like a lot more activity was going on." The court added, "The mother's delegated to the boyfriend the right to discipline the children, and I don't see that referenced in the petition. But it looks like there are times when he has done so after consuming

10

a copious amount of alcohol.[10]  In addition, [N] says just a couple of months prior to the detention, he got hit 11 times with a belt and some more after that, and further disciplined."

DCFS's counsel replied, "My thoughts are that the petition is underpled.  My thoughts are also that a lot of what [mother's counsel] said is true; it's a dispositional matter.  We set forth the way the department sees it, that there's not clear and convincing evidence at this point to justify taking the kids out.  But the risk going forward – and the court should look at the entire picture.  [¶]  The court is not limited to just the fact that the belt and – alone was pled in the petition.  The court can look at the whole thing as to whether or not there's risk, which is formed in the (a) and the (b) counts, which justify the court taking jurisdiction and keeping an eye on things.  I believe is met by preponderance of the evidence here."

The juvenile court sustained the section 300 petition under subdivisions (a), (b)(1), and (j), as pled.  The court stated:

> "[A] risk that seems to not be fully addressed, which is the delegation of responsibility to someone who is disciplining the children in a manner that I think is far beyond what [mother's counsel] described.  [¶] And the practice is more than just once or twice being struck by a belt, but described as much more extensive than that.  And so not entirely below the radar because it's referenced in reports.  But what I had highlighted in here is what looks like an underpled petition that would have had further

---

10     There was evidence that Eduardo appeared intoxicated during the domestic 2017 violence incident.  It is unclear what events to which the trial court was referring when it stated that Eduardo disciplined the children while intoxicated.

11

allegations if connected more directly with the references in the report. [¶] And so I think the department has met its burden in terms of the risk. And that's not to say mother is not engaged in trying to address it, but I think the risk is far more embedded. It would need to be addressed more comprehensively. [DCFS's counsel] had talked about the boyfriend and certain practices there."

The court added it understood mother's counsel's arguments about the petition being under pled. The court nonetheless found the petition "was sufficiently pled to trigger the court to look at if there's a current risk. And I think there are risks there in the report that would support justifying a finding."

The juvenile court's disposition order allowed the children to remain released to mother with family maintenance services. Mother's case plan included parenting classes, family preservation services, individual counseling to address case-related issues, and conjoint counseling with Eduardo when appropriate.

Mother appealed.

## DISCUSSION

Mother argues that there was insufficient evidence to support the court's jurisdictional finding because there was no evidence N suffered serious physical harm from being hit by a belt or that her children were at risk of suffering harm. She also argues that it was error to base jurisdictional findings on unpled conduct. We disagree.

1. **Applicable Law**

The juvenile court found the children dependent under section 300, subdivisions (a), (b)(1), and (j). We address only the subdivision (a) count.

12

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Jurisdiction is warranted under section 300, subdivision (a), where: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . ." (§ 300, subd. (a).)

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence. We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. However, substantial evidence is not synonymous with any evidence. . . . [W]hile substantial evidence may consist of inferences, such inferences must be a product of logic and reason and must rest on the evidence; inferences that are the result of mere speculation or conjecture cannot support a finding." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763 (internal quotation marks and citations omitted).)[11]

---

[11] Mother's substantial evidence argument is limited to subdivisions (a) and (b)(1): "*Substantial Evidence Does Not Support The Singular Allegation In The Petition Under Section 300, Subdivisions (a) And (b)(1) That Mother, On Prior Occasions, Physically Abused Nathan By Striking His Body With Belts*,

## 2. *Substantial Evidence Supports Jurisdiction*

We agree with DCFS that substantial evidence supports the juvenile court's jurisdictional finding under subdivision (a). As such, we need not and do not, address whether jurisdiction was also proper under (b)(1) and (j). (*In re Alexis E., supra,* 171 Cal.App.4th at p. 451.)

The youngest child, N, repeatedly said that mother had hit him with a belt. In October 2019, N reported that mother had struck him 11 times two months previously for not listening. He was physically disciplined more often than his mother punished him by denying him access to the family tablet. In January 2020, N repeated that mother had hit him with a belt, this time saying it happened in kindergarten. When the dependency investigator interviewed N in March 2020, the child again disclosed mother hit him with a belt, stating: " 'My mom hit me with the belt a long time ago but I don't know what age I was. She doesn't hit me anymore.' "

Other evidence corroborated N's statements. Mother herself admitted to a nurse practitioner during the children's medical evaluations that she had previously used a belt to hit the children. Mother qualified this statement by saying she stopped using the belt in 2015, when N was two years old. Given N's persistent statements as a six- and seven-year-old that he had been hit more recently than mother admitted, the court

---

*Causing Him Unreasonable Pain And Suffering.*" (All capital letters in original.)

In the conclusion section of both the opening and reply briefs, mother refers to the (j) count as "derivative." As we read mothers briefs, she contends insufficient evidence supports the finding that any children suffered actual physical harm and hence there is no evidence that they will do so in the future.

reasonably could have found mother's statement about 2015 was not credible.

Mother also had an extensive history of abuse and neglect referrals. During an investigation in 2017, the eldest child IJ disclosed that he was afraid to go home because mother hit him and used a belt a few months earlier. Although the children sometimes denied abuse, DCFS reported that mother appeared to be coaching the children. The juvenile court was entitled to credit the DCFS report and to believe N's testimony of physical abuse.

Mother repeatedly minimized her violence, denying in her conversations with DCFS that she had used a belt on the children at all. On appeal, she argues that hitting a six-year-old with a belt constitutes "age-appropriate spanking." Mother also suggests that there must be a previous injury for the juvenile court to sustain jurisdiction under subdivision (a). She asserts that there was no physical abuse because there is no evidence that mother caused N presently visible injuries or that N complained of such injuries.

That is not the law. The juvenile court is not limited by the lack of direct evidence of "bruises, welts, broken skin, . . . [or] even statements of injury" from a six- or seven-year-old to conclude there was sufficient evidence of a present danger to the children. Nor was the juvenile court required to wait "until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

The evidence supports the conclusion that even if the children had not yet suffered serious physical injury, they were at substantial risk of serious physical harm in mother's care. The juvenile court found implicitly that mother was in denial, and explicitly that mother had hit N with a belt on previous

15

occasions.  The trial was reasonably concerned that mother allowed Eduardo, the perpetrator of domestic violence against her, to return to the family home before he completed domestic violence classes.  The juvenile court expressly found that mother permitted Eduardo to discipline the children.  The court stated that the risk to the children was "embedded" in the family's life, and although mother had made some efforts at remediation, the risk needed "to be addressed more comprehensively" following the jurisdiction findings.

### 3. *The Trial Court Did Not Err by Considering "Unpled Facts"*

Mother separately argues that the juvenile court impermissibly relied on unalleged facts to sustain the petition.  By that, we assume mother asserts that only by considering the unpled allegations could the juvenile court have lawfully sustained the petition.  We are not persuaded.  Common sense tells us that a juvenile court would be abdicating its responsibilities if it ignored relevant evidence because those facts had not been expressly pled in the petition.  In ascertaining the risk of further abuse, the court may consider past events that reasonably relate to future risk.  "A dependency petition must contain a 'concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted.' (§ 332, subd. (f).)  There is no requirement, however, that Agency 'regurgitate the contents of the social worker's report into a petition[.]'  [Citation.]  The statute  'merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction.'  [Citation.]  Notice of the specific facts on which the petition is based is fundamental to due process

16

because it enables the parties to properly meet the charges." (*In re T.V.* (2013) 217 Cal.App.4th 126, 131.)

Mother cites *In re J.O.* (2009) 178 Cal.App.4th 139, 152, fn. 13, for the principle that "a court could not properly consider unalleged actions in making a jurisdictional finding." We do not read this statement as broadly as does mother. *In re J.O.* quotes from *In re Jeremy C.* (1980) 109 Cal.App.3d 384, 397 (*Jeremy C.*), that "fundamental [ ] due process" requires "[n]otice of the specific facts upon which removal of a child from parental custody is predicated" in order to "enable the parties to properly meet the charges." There, the section 300 petition contained a "bare recital of the conclusionary words of the [charging] statute," alleging that the child's home was " 'an unfit place for him by reason of neglect, cruelty, depravity or physical abuse of either of his parents, or of his guardians or other persons in whose custody or care he is.' " (*Ibid.*)

Unlike the conclusory petition in *Jeremy C.,* here the petition expressly alleged jurisdiction based on mother hitting N with a belt, causing physical injury, and creating a substantial risk of future harm. It was that specific conduct that formed the basis of the court's jurisdiction order. That DCFS presented a larger picture of family violence and evidence of the death of a sibling did not undermine the validity of the jurisdictional finding.

### DISPOSITION

The court's jurisdictional finding and dispositional order are affirmed.

RUBIN, P. J.

WE CONCUR:

MOOR, J.                    KIM, J.

17