Filed 5/23/13  In re Lillian R. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LILLIAN R., a Person Coming Under the Juvenile Court Law. | |
| ROBERT S., Petitioner, v. THE SUPERIOR COURT OF THE COUNTY OF MENDOCINO, Respondent; MENDOCINO COUNTY HEALTH & HUMAN SERVICES AGENCY, Real Party in Interest. | A136734, A137251 (Mendocino County Super. Ct. No. SCUK-JVSQ-12-16497-01) |

Robert S. (Robert), the biological father of Lillian R., seeks extraordinary writ review pursuant to California Rules of Court, rule 8.452, of the juvenile court's order setting a Welfare and Institutions Code section 366.26 hearing regarding Lillian.[1]  He claims that the section 366.26 hearing should not have been set because the court should have ruled that he was Lillian's presumed father and offered him reunification services. Robert also appeals the juvenile court's order denying his request for presumed father

---

[1] All further unspecified code sections refer to the Welfare and Institutions Code.

1

status.  At Robert's request, we consolidated the appeal with the writ petition.[2]  We affirm the juvenile court's order denying Robert presumed father status, and deny Robert's petition seeking writ relief.

## BACKGROUND

### *The Detention and Petition*

On April 18, 2012, Lillian was detained.  A social worker from the Child Protective Services (CPS) had been contacted by the sheriff's department to come and detain Lillian, as both of her parents, Robert and mother, were being arrested.  The parents had argued inside Robert's mobile home.  During the fight, they broke a mirror on a cabinet and glass was on the counter and floor.

The detective arresting Robert and mother noticed track marks and sores on much of the exposed parts of Robert's body.  Inside Robert's mobile home, the detective saw two disposable hypodermic syringes "sitting on a cabinet adjacent [to] the bed" with a folder or piece of yellow tablet paper that contained "a white powdery substance that test[ed] positive as methamphetamine."  He also observed a tablespoon and several baggies.  Both parents were under the influence of controlled substances.

The social worker interviewed both parents separately.  Mother stated that she did not live with Robert, but lived with her parents.  Robert admitted that he was a regular user of methamphetamine and had attempted to quit on numerous occasions.  He confirmed that mother and Lillian did not live with him but were visiting.

On April 20, 2012, the Mendocino County Health and Human Services Agency (the agency) filed a petition alleging that Lillian, who was less than six months old at the time, came within the provision of section 300, subdivision (b).  The petition stated that mother and Robert were unable to supervise or protect the child as mother and Robert had a violent relationship and Lillian was present when mother and Robert fought and broke a cabinet mirror.  It further alleged that mother and Robert had substance abuse

---

[2]  Alison R. (mother), Lillian's mother, is not a party to this writ proceeding or appeal.

2

problems. It also alleged that Robert had pleaded guilty to driving under the influence and leaving the scene of an accident.

The juvenile court held the detention hearing on April 23, 2012. The court appointed an attorney for mother and an attorney for Robert and the hearing was continued for one day because counsel for the child needed a one-day continuance. Although it was continuing the detention hearing, the court proceeded to consider a few matters, including the baby's parentage. Mother informed the court that she had never married Robert and was not living with him when Lillian was born. When asked whether Robert was on Lillian's birth certificate, mother responded, "No." She also confirmed that Robert had not signed anything or acknowledged in any manner that Lillian was his child. Mother believed that Robert was Lillian's parent because mother and Robert had an "off and on" relationship for the year prior to Lillian's birth. Mother stated that she had not been living with Robert but he was the only person she "had been with." She maintained that Robert had never taken care of Lillian. There had not been any DNA testing and, according to mother, Robert had not provided any financial support. When asked whether Robert told people he was Lillian's father, mother said: "I guess so. I don't know if people have asked."

The juvenile court issued temporary detention orders for Lillian. The court stated that it was important for Robert to be a part of the proceeding.

Both Robert and mother and their respective counsel appeared at the continued detention hearing on April 24, 2012. Lillian's maternal grandfather was also present at the hearing. Robert told the court that he was not on Lillian's birth certificate. He stated that he did not know when Lillian was born but that he had held himself out as her father. Robert acknowledged that there was no court document showing that he held Lillian out as his child.

Robert's counsel stated that Robert was requesting to be found the presumed father of Lillian and that Robert had held the child out to be his own. His counsel explained that Robert had visited the baby "approximately every week to week and a half." Robert claimed that he had "helped to provide food and diapers on occasion."

3

Robert conceded that he had not paid any child support and had only provided "minor necessities for the child."

Counsel for mother stated that mother claimed Robert had "given extremely minimal assistance." Counsel advised that mother "would prefer that he come forward, show a full commitment and then maybe request presumed father status in a few months after he's demonstrated a full commitment."

The juvenile court responded that it would wait until the jurisdictional hearing to decide Robert's request for presumed father status. All parties submitted on detention and the court ordered Lillian to remain detained.

***Jurisdiction, the Amended Petition, and Robert's Request for Presumed Father Status***

On May 22, 2012, the agency filed a jurisdictional report. The report indicated, among other things, that on November 16, 2011, Robert was at the hospital. Robert told a deputy that the maternal grandfather had attacked him after ordering him to stay away from his daughter and to get a job to support the baby. The deputy interviewed the maternal grandfather and he claimed that Robert had accused him of keeping Lillian away from him. Mother was also interviewed and she indicated that she had no intention of marrying Robert. She insisted that the allegations against Lillian's maternal grandfather were false.

Both parents appeared at the continued jurisdictional hearing on May 30, 2012. Robert filed a waiver of rights form and both parents submitted the matter to the court. The court amended the petition and found it true by a preponderance of the evidence.

Robert asked the court to declare him to be the presumed father. The court replied that it would continue this issue to the dispositional hearing.

On June 11, 2012, the agency filed an amended petition. The petition named Robert as the biological father, but otherwise the allegations in the amended petition did not differ significantly from those in the original petition.

The following day, on June 12, 2012, Robert filed a request to be found the presumed father of Lillian under Family Code section 7611, subdivision (d). He also asked for reunification services.

4

*Disposition*

On June 12, 2012, the agency filed its dispositional report. The agency recommended reunification services for mother. The agency indicated that Lillian had already been placed with the maternal grandparents. The social worker disclosed that she had tried to contact Robert and mother, but neither had called her back. Robert had not visited Lillian. He had not contacted the agency and had not asked for visitation. The agency maintained that Robert was an alleged father and not entitled to reunification services.

The juvenile court held the dispositional hearing on June 14, 2012. Mother and her attorney and Robert's attorney were present; Robert was not present. Counsel for Robert objected to the agency's recommendation not to offer Robert services and asserted that he was a presumed father. The court ruled that there was insufficient evidence to grant Robert "presumed father status at this point. To the extent that there's that request today, that's denied." The court found that the declaration of Robert's counsel was based on hearsay and it would not consider counsel's statements about what Robert had told her. The court elaborated: "[B]ased on the information in the report and the nonhearsay statements in [counsel's] declaration, I don't find sufficient evidence to give him presumed father status. He's not had any contact with the agency, and there's been no visits. In terms of him holding out the child as his own, I don't think there's—there's not admissible evidence before the court that would show that there's a sufficient quantity or quality with respect to that to satisfy the requirements of [Family Code section] 7611, [subdivision] (d)."

The court continued: "So you know, that's not—that's not set in stone. If he does take steps necessary to demonstrate presumed father status and show that he wants services, that's another matter. But at this time I'm not going to grant services to the father."

The juvenile court heard argument from mother's counsel that Robert had appeared at her home in the morning before this hearing and had threatened her. A neighbor had called the police. The court ordered Robert to have no contact with mother

5

except through the attorneys. The court ordered reunification services for mother. The court found that no biological or statutorily presumed father status had thus far been established and it was not in the best interest of the child to offer reunification services to the alleged father. It ruled that Robert should not be offered reunification services pursuant to section 361.5, subdivision (a). The court also found that visits between Lillian and Robert would be detrimental to Lillian's well-being.

***Robert's Amended Motion for Presumed Father Status***

On July 5, 2012, Robert filed a request to add to the calendar his motion to be declared as Lillian's presumed father. Robert attached his declaration avowing that he had provided financial support for food and diapers. He asserted that he "saw Lillian for visits every seven to ten days, and [that mother] and Lillian ha[d] spent the night" in his home "approximately 10 times."

On July 10, 2012, Robert filed the JV-505 form, "Statement Regarding Parentage." He did not check the boxes indicating that he had established parentage, that the child had lived with him for any period of time, or that he had participated in any activities with the child. He claimed that he provided money for the child's food and diapers, but did not specify the amount. He checked the box indicating that Lillian had spent time with Robert's mother and stepfather, but did not specify the amount of time. On this same date, Robert filed an amended memorandum of points and authorities. He attached photographs of Lillian with him and with his parents and him.

On July 11, 2012, the court held a hearing on a 30-day substance abuse review as to mother. Robert was present but mother was not. The court was informed that mother had not participated in any of the reunification services and had not engaged in any treatment.

The juvenile court also considered Robert's amended request for presumed father status. Counsel for the minor supported a DNA test for Robert and expressed concerns about the minimal amount of time Robert had spent with Lillian before her detention and the lack of contact after her detention. Counsel added: "However, he is here, he's willing to step forward, he's asking for presumed father status. I think that says

6

something about his interest in commitment. So I have no objection to the court finding presumed father status today."

County counsel responded that the baby had not seen Robert in over three months and Robert had not returned the social worker's phone calls. The agency had no opportunity to observe Robert with the child. Counsel added that it was "baffling why he is requesting presumed father status when he hasn't even made a request to see his daughter in all this time. So I think at this point if the father does actually have an interest in this child, perhaps a good starting point would be to look at modifying the no-visitation order and have him meet with the social worker to assess whether visitation is appropriate at this time."

Counsel for Robert stated that his social worker wanted him to engage in services before beginning visitation. Counsel for Robert argued that the child should have two parents.

The juvenile court decided not to rule on the request for presumed father status at this time. The court ordered a paternity test to take place. The court modified the no-visitation order to permit Robert a minimum of one visit with Lillian to occur before the next hearing scheduled for August.

### De Facto Parent Status and August Hearings

On August 2, 2012, Lillian's maternal grandparents filed a request for de facto parent status and a de facto parent statement. The maternal grandparents indicated that Lillian had been living with them since a couple of days after her birth, and that they had responsibility for the day-to-day care of the child.

On August 8, 2012, a 60-day substance abuse review regarding mother was held. Mother appeared and the court was told that mother was still abusing drugs and not engaged in services. The court admonished mother that she had "a lot of stuff to do" and set a 90-day substance abuse treatment review.

At a hearing on August 28, 2012, the agency reported that the DNA results were still not available. Over an objection by Robert's counsel, the court granted the agency's request for a continuance on the determination of father's request for presumed father

7

status. Robert was not present because he was in the hospital as a result of injuries he had suffered in a car crash. The court granted the maternal grandparents' request for de facto parent status.

### The Paternity Status Hearing and Robert's Notice of Appeal

The agency on September 17, 2012, filed its report and recommendation regarding paternity status. The DNA test confirmed Robert as the biological father of Lillian with a 99.99 percent probability.

The report declared that Robert was facing numerous legal problems and had an extensive history of substance abuse. The report set forth Robert's numerous arrests in California and other states. The accident in August 2012, which prevented Robert from attending the hearing on August 28, 2012, was caused by Robert; he had been driving while under the influence. The accident injured Robert and two teenagers. After he was released from the hospital, Robert went to Michigan to live with his parents and have them care for him.

The report was prepared by social worker Joan Ross, and she noted that Robert had not contacted the agency to request visitation with Lillian until after the dispositional hearing. Robert had received one court-ordered visitation with Lillian, which occurred on July 25, 2012. Ross supervised the visit and observed that the "visit went fine with [Robert] only needing a couple prompts to check Lillian's diaper or offer her a bottle when she was fussing. The baby fell asleep during the latter half of the visit while [Robert] held her. [Robert] did not bring any essentials for the baby to this visit. However, the grandparents provided a full diaper bag with necessities to meet her needs."

Robert had requested through his attorney a visit with Lillian while he was in the hospital after his August accident. The agency, however, declined to provide a visit because of the seriousness of his injuries and the probability that he was medicated. Robert had not sent any items to meet Lillian's needs and had not sent any gifts or other items. Robert had not made any offer to provide any financial help for Lillian's care. Ross stated that it appeared that Robert had never independently cared for Lillian. The agency recommended that Robert not receive reunification services.

8

Attached to the agency's report was, among other things, the report by the officer for the California Highway Patrol regarding Robert's accident on August 19, 2012. After talking to people involved in the accident, the officer concluded that Robert was traveling northbound and had crossed over the double yellow lines into the lane of the southbound traffic. The officer noticed that Robert had scars and scab marks on his arm consistent with illegal drug use. The officer smelled the "strong odor of marijuana emitting" from his vehicle. Inside the vehicle, the officer found narcotics, narcotic paraphernalia, and evidence of prescription drug abuse. The officer concluded that Robert caused the collision and was driving under the influence of drugs.

The juvenile court held a hearing on September 18, 2012, on Robert's request for presumed father status and reunification services. Robert's counsel was present and stated that Robert was in Michigan; counsel waived Robert's appearance. The court acknowledged that it had the tests indicating that Robert was the biological father of the child and it had the agency's report and recommendation.

Counsel for Robert argued that Robert had held Lillian out as his own child and that maternal grandfather had thwarted his efforts to be in his child's life. He also cited the photographs showing Robert with the baby. He stressed that Lillian had stayed at Robert's home overnight at least 10 times and that Robert had visited with Lillian the one time the agency permitted him to visit her. Counsel argued that Robert should not be denied presumed father status simply because mother and the maternal grandparents did not like him.

Counsel for mother asserted that mother would testify that she came to Robert's home and stayed overnight with the child about three times, not 10 times. Counsel maintained that mother would testify that Robert did not change Lillian's diaper and might have fed her one time.

Counsel for the child argued that Robert presented no evidence that he tried to have contact with Lillian, which was thwarted. The minor's attorney agreed with the agency's position that Robert is merely a biological father. Counsel stressed that Robert "had minimal contact" with Lillian and had not shown much effort during these

9

dependency proceedings. Counsel added that Robert was absent from many of the court hearings even before he moved out of the state.

Counsel for the agency maintained that the record was devoid of any evidence showing that anyone thwarted Robert's efforts to establish a relationship with Lillian prior to the involvement of CPS. Furthermore, after Lillian was detained in April 2012, Robert did not request visitation until the dispositional hearing on June 14, and then he did not appear at the dispositional hearing. She emphasized that the dispositional hearing was especially important as that was when Robert was named the alleged father in the report, was denied reunification services, and was ordered not to have any visitation with Lillian. Counsel stated that the only time Robert requested visitation was when he was in the hospital.

The maternal grandfather asked for permission to speak at the hearing. He stated that the baby had been in his home since she was born and Robert never offered any support even though he knew where they lived. Grandfather disclosed that Robert's family never called and never offered any support. Robert never called to ask to see the baby. He testified that mother took Lillian to Robert's mobile home three or four times. Grandfather admitted that he never invited Robert to the house or talked to him about Lillian. Grandfather did drive to Robert's home and take him to the hospital after Lillian was born.

The juvenile court took the matter under submission and then issued its ruling at a hearing on September 26, 2012. The court explained: "[T]his is kind of a close case in a sense that father, there was some evidence that the father held himself out to a family member. There's a photograph and also some evidence that he received the child in his home, the child visited there on at least a few occasions." The court concluded that Robert had not met his burden of proof of establishing presumed father status by a preponderance of the evidence. Thus, the court denied Robert's request for presumed father status.

On September 28, 2012, Robert filed a notice of appeal from the order denying him presumed father status.

***The Six-Month Status Review and Robert's Writ Petition***

The agency filed its six-month status review report on November 14, 2012. The report indicated that Robert was in jail awaiting sentencing. Mother, according to the report, had continued to abuse drugs and had not complied with the services set forth in her case plan. The agency recommended terminating mother's reunification services.

On November 28, 2012, the juvenile court held the six-month status review hearing. Both parents appeared. Robert's counsel again requested the court to grant Robert presumed father status. The court responded that it could not rule on this issue because it was on appeal. Counsel for Robert objected "to every request made by the" agency and to all of its recommendations. Robert's attorney also objected to the setting of a section 366.26 hearing and asked for reunification services for Robert. Counsel for Robert added that Robert wanted the court to know that he had participated in a course on men's alternative to violence while in custody and that he had been attending Alcoholics Anonymous and Narcotics Anonymous meetings. He also wanted the court to know that he was awaiting trial on the charges pending and not awaiting sentencing as stated in the agency's report.

The juvenile court found that clear and convincing evidence showed that the return of Lillian to mother would create a substantial risk of detriment to the safety, protection or physical or emotional well-being of the child, and it adopted the findings and recommendations of the agency. The court terminated mother's reunification services. The court ordered no visitation for Robert. It set a section 366.26 hearing for March 28, 2013.

On November 30, 2012, Robert filed a notice of intent to file a writ petition, challenging the setting of the section 366.26 hearing. On January 4, 2013, Robert filed his writ petition and we issued an order to show cause on January 8, 2013. At Robert's request, we granted a temporary stay of the section 366.26 hearing scheduled for March 28, 2013, and consolidated the writ with Robert's appeal. All of the briefs in the appeal were filed by the end of April 2013.

11

# DISCUSSION

## I. *Denial of Presumed Father Status*

### A. *No Forfeiture or Waiver*

The agency contends that we should dismiss Robert's appeal challenging the denial of his request for presumed father status and that this issue was not preserved for writ review. The agency maintains that the juvenile court denied Robert reunification services and presumed father status at the dispositional hearing. The dispositional order in a dependency proceeding is an appealable judgment. Robert did not appeal from that judgment and thus, according to the agency, Robert has forfeited his right to object to the court's ruling on his presumed father status.

"A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1).) "In a section 300 proceeding, the order entered at the dispositional hearing is a final judgment . . . ." (*In re Daniel K.* (1998) 61 Cal.App.4th 661, 666.) California Rules of Court, rule 8.406(a)(1) provides that a parent has 60 days from the date of an appealable order in dependency proceedings to file an appeal. This rule is jurisdictional. (Cal. Rules of Court, rule 8.406 (c); *Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 666-670.)

In the present case, the dispositional order was filed in June 2012, and Robert filed his notice of appeal more than 60 days later in September 2012. Robert, however, is not appealing the dispositional order. His appeal challenges the juvenile court's order in September 2012, which again denied him presumed father status.

Robert's writ petition is from the setting of the section 366.26 hearing. His writ raises the same issue raised by his appeal. He claims that he should have been given presumed father status and reunification services and that the section 366.26 hearing should not have been set.

The law is clear that "an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150.) "In other words, 'A challenge to the

12

most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed.' [Citation.] The rule serves vital policy considerations of promoting finality and reasonable expedition, in a carefully balanced legislative scheme, and preventing late-stage 'sabotage of the process' through a parent's attacks on earlier orders. [Citation.]" (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.)

We agree with the agency that we cannot address claims of error concerning the dependency court's dispositional order. However, we can address any claim of error regarding the order issued on September 26, 2012. The evidence presented at the September hearing was significantly different from that presented at the dispositional hearing: Robert did not attend the dispositional hearing; the DNA testing had not been completed by the time of the dispositional hearing; and Robert's counsel submitted almost no admissible evidence at the dispositional hearing.[3] Thus, in this appeal and writ, Robert cannot challenge any findings related to the dispositional order, but he can claim that the new and additional evidence submitted at the September 2012 hearing established that he was the presumed father.

The agency relies on *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391 (*Wanda B.*), when urging us to dismiss the appeal and conclude that Robert cannot challenge the denial of his presumed father status in his writ petition. In *Wanda B.,* the mother had been denied reunification services at the dispositional hearing, but the father had received them. (*Id.* at p. 1394.) About six months later, the juvenile court terminated the father's services and set a section 366.26 hearing. (*Wanda B.,* at pp. 1394.) The mother filed a writ petition, and attempted to attack the denial of her reunification services. (*Id.* at p. 1395.) The appellate court held that the mother had forfeited the right to challenge the denial of reunifications services because she had not filed a timely appeal from the dispositional order. (*Id.* at pp. 1395-1396.)

---

[3] Robert's counsel submitted a declaration that contained inadmissible hearsay about what Robert had told her.

The present case is clearly distinguishable from *Wanda B., supra,* 41 Cal.App.4th 1391. The trial court in *Wanda B.* had terminated the mother's reunification services at the dispositional hearing and did not, subsequently, revisit the issue because of new or additional evidence. The mother's belated attempt in *Wanda B.* to challenge the finding in the dispositional order by filing a writ after the juvenile court terminated the father's services and set a section 366.26 hearing was clearly an improper attempt to sidestep the effect of section 395. (*Wanda B.,* at p. 1396.) In contrast, here, the juvenile court at the hearing in September 2012 considered new and additional evidence. Moreover, the court made it clear at the dispositional hearing that its ruling on presumed father status was not final in the respect that the court invited Robert to ask the court to reconsider this issue when he had new or additional evidence supporting his claim of presumed father status.

Accordingly, we conclude that Robert has not forfeited any challenge to the order in September 2012 that denied him presumed father status.[4]

## B. *The Governing Law and Standard of Review*

Only a presumed father enjoys the panoply of rights set forth by the dependency statutes and a father who is an alleged or a biological father is entitled to fewer rights. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) The Family Code sets forth the criteria for determining presumed father status, which include: a man marries or attempts to marry the child's mother, he and the mother execute a voluntary declaration of paternity,

---

[4] The agency also argues that Robert has not demonstrated that he did not have an adequate remedy at law. When there is an adequate remedy at law, writ relief is not available. (*Joe B. v. Superior Court* (2002) 99 Cal.App.4th 23, 27.) In the present case, Robert's appeal raises the same issues as the writ and "[g]enerally the availability of an appeal constitutes an adequate remedy at law precluding writ relief." (*Kawasaki Motors Corp. v. Superior Court* (2000) 85 Cal.App.4th 200, 205-206.) In *Joe B.,* as here, the same issues were raised in the writ as in the appeal and the appellate court denied the writ petition because the opinion in the father's appeal was issued concurrently with the denial of the father's writ petition. (*Joe B.,* at p. 27.)

Here, the writ petition was filed prior to the filing of *all* of the appellate briefs and the same issues are raised in both the writ and appeal. Although we could summarily deny the writ, our opinion decides the merits of the arguments in both Robert's writ and appeal.

14

or he receives the child into his home and openly holds out the child as his natural child. (Fam. Code, §§ 7571; 7573; 7611, subds. (a)-(d).)  A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father.  (*In re Zacharia D.,* at p. 449, fn. 15.)  An alleged father is a man who may be the father of the child but who has not established biological paternity or presumed father status.  (*Ibid.*)

In dependency proceedings, a man's status as a presumed father is critical.  (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1410.)  "[P]resumed fathers possess far greater rights than alleged or biological fathers.  [Citation.]  Only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services, and only a presumed father is entitled to custody of his child.  [Citation.]  In contrast, the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child."  (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596; see also *In re A.A.* (2003) 114 Cal.App.4th 771, 779-780.)

Here, the paternity test established that Robert was the biological father. However, " 'the mere existence of a biological link does not merit . . . constitutional protection' [citation]; rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by ' "com[ing] forward to participate in the rearing of his child" ' . . . and 'act[ing] as a father.' "  Simply because a man is the biological father does not mean that he is entitled to constitutional rights. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1052.)  " 'Parental rights do not spring full-blown from the biological connection between parent and child.  They require relationships more enduring.' "  (*Lehr v. Robertson* (1983) 463 U.S. 248, 260, italics omitted.)  Accordingly, a biological father who does not fully grasp the opportunity to establish a relationship with his child does not have a constitutional right to object to the termination of his rights.  (*Id.* at p. 262; *Adoption of Michael H.,* at p. 1060.)

Sometimes, the mother or another third party prevents the purported father from satisfying the factual predicates needed for "presumed father" status, such as barring him from physically receiving the child into the home.  (*Adoption of Kelsey S.* (1992) 1

15

Cal.4th 816, 825 (*Kelsey*).) "[A]n unwed biological father who comes forward at the first opportunity to assert his paternal rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under [Family Code] section 7611 by the unilateral conduct of the child's mother or a third party's interference" acquires a status "equivalent to presumed parents status under [Family Code] section 7611." (*In re M.C.* (2011) 195 Cal.App.4th 197, 213, 220.) Thus, an unwed man may have a constitutional right to presumed father status if he "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise . . . ." (*Kelsey,* at p. 849.) The court must consider the father's conduct "both *before and after* the child's birth . . . ." (*Ibid.*) "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' " (*Ibid.*) Where an unwed father has demonstrated such a parental commitment, his federal constitutional right to due process prohibits terminating his parental rights absent a showing of his unfitness as a parent. (*In re Zacharia D., supra,* 6 Cal.4th at p. 450.)

In the present case, Robert claims that the court should have found him to be a presumed father under Family Code section 7611, subdivision (d), or it should have found that he was a *Kelsey* father. "We review a juvenile court's determination of presumed parentage status under the substantial evidence standard." (*In re M.C., supra,* 195 Cal.App.4th at p. 213.) " '[W]e review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. [Citation.] We do not reweigh the evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found for the respondent. [Citation.]' [Citation.]" (*Ibid.*)

**C.** *Robert Is Not Entitled to Presumed Father Status Under Family Code Section 7611, Subdivision (d)*

Family Code section 7611 sets forth several rebuttable presumptions under which a man may qualify as a presumed father. If the alleged or biological father meets his burden of establishing the foundational facts supporting his entitlement to presumed father status, the statutory presumption may be rebutted in an appropriate action only by clear and convincing evidence. (Fam. Code, § 7612, subd. (a); *In re M.C., supra,* 195 Cal.App.4th at p. 212.)

The only rebuttable presumption under Family Code section 7611 at issue here is subdivision (d), which states that the man "receives the child into his home and openly holds out the child as his natural child." (Fam. Code, § 7611, subd. (d).) This statute requires that the unwed biological father " 'must not only openly and publicly admit paternity, but must also *physically* bring the child into his home.' " (*In re M.C., supra,* 195 Cal.App.4th at p. 212.)

To determine " 'whether a man has "receiv[ed a] child into his home and openly h[eld] out the child" as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental.' " (*In re J.H.* (2011) 198 Cal.App.4th 635, 646.)

When arguing that he is entitled to presumed father status, in his appeal, Robert cites *In re A.A., supra,* 114 Cal.App.4th 771, as setting forth an expansive interpretation of the "receives" requirement under subdivision (d) of Family Code section 7611. (*In re A.A.,* at p. 784.) In *In re A.A.,* two men claimed to be the presumed father, and the

17

juvenile court found that the biological father was entitled to presumed father status. The appellate court reversed because the evidence was that the biological father had lived with the mother for only one to three months after the child's birth, had visited the child for only about one year after that, and had failed to support the child financially at any time. (*Id.* at pp. 786-787.) The appellate court concluded that the other man claiming to be the presumed father had presented evidence to satisfy the presumption under Family Code section 7611, subdivision (d). Although the child had not lived with this man on a full-time basis, this man had been involved with the child from the very beginning, had cared for the child, had provided financial support, and had held himself out as the child's father over the course of many years. (*In re A.A.,* at p. 784.)

Robert cites *In re A.A., supra,* 114 Cal.App.4th 771, in support of his argument that he is entitled to presumed father status but this decision actually supports the juvenile court's finding that he is not entitled to that status. The appellate court in *In re A.A.* concluded that the biological father was not entitled to presumed father status, even though he had lived with the child for one to three months, which is significantly longer than Lillian's three to 10 overnight visits with Robert.[5] The reviewing court in *In re A.A.* held that the father had not demonstrated that he had been involved in the parental tasks and the time the child had lived with the biological father was "exceedingly small." (*Id.* at p. 786.) The appellate court noted that the biological father had avoided "the constant parental-type tasks that come with having the child in his own home—such as feeding and cleaning up after the minor, changing her clothing bathing her, seeing to her naps, putting her to bed, taking her for outings, playing games with her, disciplining her, and otherwise focusing on the child." (*Id.* at pp. 786-787.) Similarly to the biological father in *In re A.A.,* Robert has completely avoided the parental-type tasks. Mother's uncontradicted statement was that during the overnight visits, Robert did not change Lillian's diaper and might have fed her one time. Nothing in the record shows that

_____

[5] Robert claimed mother and Lillian stayed overnight about 10 times but mother's counsel asserted that mother would testify that they stayed overnight at Robert's home only three times.

18

Robert fed Lillian, changed her diapers or clothing, made sure that she took naps, or put her to bed.

Robert points to favorable evidence in the record to support his claim that he should be granted presumed father status. He explains that he immediately acknowledged his parental status and asked the juvenile court at the detention hearing to find him to be Lillian's presumed father. Moreover, he emphasizes that he repeatedly asked the court throughout the dependency proceedings to grant him presumed father status. Additionally, he submitted photographs of Lillian with him, and some of the photographs included Lillian's paternal grandparents. He stresses that he paid for some of Lillian's food and diapers. Robert argues that the foregoing favorable facts distinguish his situation from the parent *In re Spencer W.* (1996) 48 Cal.App.4th 1647, the case cited by the agency in the trial court.

In *In re Spencer W., supra,* 48 Cal.App.4th 1647, the alleged father failed to support the child, lived with child's mother only while the mother provided financial support to the alleged father, and demonstrated no interest in the child while he was in jail. (*Id.* at pp. 1653-1654.) As with all of these fact-intensive cases, the facts in *In re Spencer W.* are both similar and different from the facts in the present case. Robert has clearly displayed more interest in Lillian than the father in *In re Spencer W.* showed towards the child, but he has not demonstrated that he has been involved in parental-type tasks. As already noted, mother stated that on the few occasions that she stayed overnight at Robert's mobile home with Lillian, Robert did not change her diaper and she did not believe he fed her. On the one occasion that Robert visited Lillian during the dependency proceedings, the social worker noted that Robert failed to bring any essentials for the visit with the baby and that the maternal grandparents provided a full diaper bag with the items necessary to meet the baby's needs. The social worker reported that Robert had never independently cared for Lillian.

Robert had minimal contact with Lillian prior to her detention, and then had even less contact with her after the detention. After Lillian was detained in April 2012, Robert saw Lillian only once, on July 25, 2012. The social worker, Ross, stated that Robert

19

never contacted the agency to request visitation with Lillian until after the dispositional hearing. Robert did not appear at some of the dependency hearings, including the dispositional hearing, and did not attempt to contact the social worker to inquire about Lillian's well-being. Maternal grandfather testified that Lillian had been in the maternal grandparents' home since her birth, and Robert had not offered them any support or called asking to see the baby.

Other than purchasing some diapers and some food before Lillian was detained, Robert provided no financial support for Lillian. Maternal grandfather testified that Robert provided no financial support for Lillian.

Additionally, there is no evidence that Robert helped mother in prenatal care. There is no evidence that he paid or attempted to pay pregnancy and birth expenses. Robert did not have his name placed on Lillian's birth certificate.

The abovementioned evidence amply supported the juvenile court's findings that Robert did not meet his burden of proof for establishing that he was entitled to presumed father status under Family Code section 7611, subdivision (d).

Robert contends that public policy supports a finding of presumed father status and relies on *In re J.O.* (2009) 178 Cal.App.4th 139. Robert cites the following language in the opinion: "Refusing to grant presumed father status to a man such as appellant, where no other parental figure is available to fill the gap, would serve only to punish the children by depriving them of a second parent." (*In re J.O.,* at p. 149.) He maintains, that similarly, here, denying him presumed father status deprives Lillian of a father.

In *In re J.O., supra,* 178 Cal.App.4th 139, the trial court found that the father had established his status as presumed father under Family Code section 7611, subdivision (d), but that the presumption had been rebutted by clear and convincing evidence that father had failed to provide financial support to his children and had no contact with them in several years. (*In re J.O.,* at p. 146.) The appellate court reversed and held that the man's later failure to maintain contact or provide support could not be the basis for rebutting the paternity presumption under Family Code section 7611, subdivision (d). (*In re J.O.,* at p. 150.) In contrast, here, Robert did not establish the paternity presumption

20

under Family Code section 7611, subdivision (d) and the lower court never had to consider whether this presumption had been rebutted. *In re J.O.* does not suggest that public policy supports the granting of Robert presumed father status in a situation, like the present, where Robert has failed to establish the paternity presumption under Family Code section 7611, subdivision (d).

Robert also cites Family Code section 7570, subdivision (a) in support of his argument that public policy demands that he be granted presumed father status. Robert quotes the following language in Family Code section 7570, subdivision (a): "There is a compelling state interest in establishing paternity for all children" and "knowing one's father is important to a child's development." Robert ignores the remaining language in this statute, which establishes that this provision is concerned with the need to establish paternity as "the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights. Knowledge of family medical history is often necessary for correct medical diagnosis and treatment." (Fam. Code, § 7570, subd. (a).)

In the present case, the DNA testing of Robert promoted the policy underlying Family Code section 7570. (See *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 123.) Family Code section 7570 does not suggest that a biological father should be accorded the rights of a presumed father. The very purpose of the Uniform Parentage Act (Fam. Code, § 7600 et seq.) is "to distinguish those who have demonstrated a commitment to the child regardless of biology and grant them the 'elevated status of presumed [parenthood].' " (*E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1085.) Thus the public policy in situations, such as the present, where the biological father has not achieved presumed father status as defined in Family Code section 7611 and "demonstrated an abiding commitment to the child and the child's well-being" (*E.C.,* at p. 1085) is that the "biological" father's paternal rights may ultimately be terminated in the dependency process. (See, e.g., *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596.)

21

In the present case substantial evidence in the record supports the lower court's finding that father did not establish presumed father status under Family Code section 7611, subdivision (d). (See *In re M.C., supra,* 195 Cal.App.4th at p. 213.) Granting Robert presumed father status when he has not demonstrated a commitment to Lillian would not further public policy.

**D.** *Robert Did Not Establish that He Is a Kelsey Father*

Robert contends that he provided sufficient evidence to establish that he is a *Kelsey* father. Robert claims that he promptly came forward to demonstrate a full commitment to his parental responsibilities but was thwarted in his efforts by maternal grandfather and the agency. He claims that the maternal grandfather limited his contact with Lillian and the court ordered no visitation at the dispositional hearing.

The record does not support Robert's claim that he is a *Kelsey* father. Robert's conduct both before and after Lillian was detained supports the juvenile court's conclusion that Robert did not assume his parental responsibilities—emotional, financial, or otherwise. As already discussed, Robert did not offer any financial support, did not contact the agency social worker to inquire about Lillian's care or offer any support, and spent minimal time with her.

The record does not support Robert's claims that the grandparents prevented him from assuming his parental responsibilities. Firstly, he did not demonstrate that he made any particular effort that was frustrated. Secondly, maternal grandfather picked Robert up and brought him to the hospital to see Lillian when she was born. Robert did report that the maternal grandfather had attacked him after ordering him to stay away from his daughter and to get a job to support the baby, but mother claimed Robert's allegations against Lillian's maternal grandfather were false. The record does not establish that Robert ever asked the maternal grandfather whether he could see Lillian. Nothing in this record demonstrates that the maternal grandfather stopped Robert from seeing Lillian or prevented him from carrying out his parental responsibilities towards her. Instead, the record shows that Robert never called the maternal grandfather to ask about the baby's welfare or to offer any assistance.

22

Robert also argues that the agency and court thwarted his efforts because at the dispositional hearing, which he did not attend, the court ordered no visitation between Lillian and Robert. This argument is not persuasive because Robert did not visit Lillian between the detention hearing on April 23, 2012, and the dispositional hearing on June 14, 2012. At that time, there was no court order preventing visitation. Not only did Robert not visit Lillian during this period, he never contacted the agency to request a visit. The agency tried several times to reach Robert, but he never returned the phone calls.

The evidence in the record abundantly supported the juvenile court's finding that Robert was not a *Kelsey* father.

## II. *No Due Process Violation*

Robert contends that the juvenile court violated his due process rights because it waited until the dispositional hearing to find that he was not the presumed father even though the court knew at the detention hearing that he was the alleged father. Additionally, Robert claims that the court did not make the JV-505 form available to him in a timely manner.

Section 316.2 requires the juvenile court at the detention hearing, or as soon thereafter as practicable, to "inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers." (See *In re B.C.* (2012) 205 Cal.App.4th 1306, 1311-1312.) California Rules of Court, rule 5.635(h) provides: "If a person appears at a hearing in dependency matter . . . and requests a judgment of parentage on form JV-505, the court must determine: [¶] (1) Whether that person is the biological parent of the child; and [¶] (2) Whether that person is the presumed parent of the child, if that finding is requested." (See also *In re Paul H.* (2003) 111 Cal.App.4th 753, 760-761.) Thus "[d]ue process for an alleged father requires . . . that the alleged father be given notice and 'an opportunity to appear and assert a position and attempt to change his paternity status." (*Id.* at p. 760.)

Here, the juvenile court did inquire about and attempt to determine the parentage of Lillian at the detention hearings on April 23 and April 24, 2012. On April 23, the

23

court asked mother about Lillian's parentage, and mother told the court that she believed that Robert was Lillian's father. She informed the court that she had never married Robert and was not living with him when Lillian was born. She also disclosed that Robert's name was not on Lillian's birth certificate and that Robert had not signed anything or acknowledged in any manner that Lillian was his child. The following day, on April 24, Robert appeared with his counsel and Robert told the court that he was not on Lillian's birth certificate. He stated that he did not know when Lillian was born but that he had held himself out as her father. Robert acknowledged that there was no court document showing that he held Lillian out as his child. Robert conceded that he had not paid any child support and had only provided "minor necessities for the child."

The juvenile court delayed ruling on Robert's request for presumed father until the dispositional hearing to permit Robert more time to garner evidence to support his request. The language of section 316.2 specifies that the court should inquire of the mother about the identity of the father "[a]t the detention hearing, or as soon thereafter as practicable . . . ." There is no requirement that a determination of biological paternity must be made at a particular time. Robert did not even complete the JV-505 form until July 10, 2012. The court in the present case made the determination of biological paternity once the DNA testing was complete.

Robert relies on *In re B.C., supra,* 205 Cal.App.4th 1306, but this case is unavailing. The court held in *B.C.* that the juvenile court *must* make a determination of biological paternity when the alleged father files a JV-505 Statement, requests genetic testing to determine whether he is the dependent child's biological father, and declares that if he were found to be the biological father, he would meet the paternal obligations. (*In re B.C.,* at pp. 1312-1313.) Here, the court ordered DNA testing and made a determination of Lillian's paternity.

We thus conclude that Robert had proper notice and was given an opportunity to appear and present his evidence. He was accorded all of the notice and process that was due.

24

Furthermore, even if Robert could establish that the delay in ruling on his request until June 14, 2012, when the court denied him presumed father status, violated his due process rights, this alleged error was harmless. " 'We typically apply a harmless-error analysis when a statutory mandate is disobeyed, except in a narrow category of circumstances when we deem the error reversible per se.' " (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1122.) Although Robert was an alleged father only, the juvenile court nonetheless appointed him counsel at the detention hearing on April 23, 2012. Robert was provided every opportunity to show that he was a presumed father, but could not do so. Robert was able to participate in the dependency proceedings; he cannot demonstrate how the delay in ruling on his presumed father request hurt him. To the contrary, the delay benefitted him as it provided him more time to establish a parental relationship and commitment to Lillian.

When urging this court to conclude that the delay was prejudicial to him, Robert relies on *In re Paul H., supra,* 111 Cal.App.4th 753. In *In re Paul H.*, the appellate court reversed the judgment terminating parental rights after concluding that the alleged father did not have appointed counsel and was not afforded the opportunity to request court-ordered paternity testing under section 316.2. (*In re Paul H.,* at pp. 755, 761-762.) This case does not benefit Robert because, unlike the situation in *In re Paul H.,* Robert had an appointed attorney and the court ordered DNA testing.

Robert claims that an earlier ruling by the juvenile court would have entitled him to visitation with Lillian earlier and then he would have been offered reunification services at the dispositional hearing. This argument is completely without merit. As already stressed, there was no order preventing Robert from visiting Lillian before the dispositional hearing. Yet, he neither visited Lillian nor contacted the agency to make any request to visit Lillian or inquire about her welfare. Indeed, by the time the court made its first ruling on Robert's request for presumed father status, at the dispositional hearing, there was almost no evidence to support presumed father status and Robert did not even attend that hearing. There is absolutely nothing in this record to show that Robert would have behaved any differently had the juvenile court denied his request for

25

presumed father status earlier at the detention hearing. On this record, there is no reasonable probability that Robert could have obtained a different result if the juvenile court had ruled earlier on his request for presumed father status.

We conclude that Robert was provided ample opportunity to participate in the proceedings and to establish his claim of presumed father status; he was accorded all of the notice and process that he was due. Furthermore, any alleged due process violation was harmless.

## DISPOSITION

In the appeal (A136734), the juvenile court's order denying Robert presumed father status is affirmed. In the writ proceeding (A137251), the petition challenging the juvenile court's order setting a section 366.26 hearing is denied on the merits. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 894 [barring later challenge by appeal].) Our decision regarding the writ is final as to this court immediately. (Calif. Rules of Court, rule 8.490(b)(3).) This court's temporary stay of the section 366.26 hearing is dissolved.

_____
Lambden, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.

26